No. 48,202

STATE OF KANSAS, *Appellee,* v. MOORE CHILDERS, *Appellant.*

(563 P.2d 999)

Opinion filed April 9, 1977. ▮▮▮▮▮▮

*Jack D. Sage,* of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause and was on the brief for the appellant.

*Stephen M. Joseph,* Assistant District Attorney, argued the cause, and *Curt T. Schneider,* Attorney General, and *Vern Miller,* District Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: Defendant-appellant (Moore Childers) appeals from a conviction by a jury of second degree murder (K. S. A. 21-3402). This is the second appearance of this case before this court. Defendant was previously convicted of the same charge by a different jury. The prior conviction was reversed in *State v. Childers,* 217 Kan. 410, 536 P. 2d 1349, because of the trial court's failure to instruct on the lesser included offense of involuntary manslaughter (K. S. A. 21-3404). Upon remand the case was retried before another trial judge who submitted the previously omitted lesser offense instruction, but the trial resulted in the same jury verdict as that returned in the first trial. This appeal followed.

The record reflects that the state's evidence in the second trial closely parallels the facts recited in our opinion in the first

appeal. Therefore, only a brief summarization is necessary.

The deceased, James C. Frost, lived with his wife and stepson next door to the defendant's residence. During the evening of July 21, 1973, the Frosts had visitors at their residence who had a young son about the same age as that of the deceased's five year old stepson. The two boys were playing between the two houses during the evening in question and their activities apparently caused defendant's dogs to bark. Defendant and his wife, who had gone to bed at an earlier hour, were awakened and defendant got up and went outside to ascertain the cause of the dogs barking. Defendant told the boys to quit bothering the dogs and induced them to leave his premises by giving them some candy. Defendant then returned to his house and went back to bed.

A few minutes later Emory Farris, a thirteen year old boy who lived across the street, went over to the Frost residence. The boys told Farris of their encounter with the defendant and that he had given them some candy to keep off his yard and that he "cussed at" them. In the meantime, Frost returned from a neighbor's house where he had been visiting and was informed by Farris what he had been told by the boys. Farris testified that thereupon Frost, the deceased, stated that he was going to have a talk with defendant and proceeded toward defendant's house. Farris followed along and overheard a conversation between Frost and defendant at a bedroom window of defendant's house. According to Farris defendant told Frost that he had given the boys candy to keep them off his yard and added that if they did not stay off he would "blow their asses off."

As Farris and Frost were leaving the defendant's premises defendant was heard to mumble something. Frost returned to the bedroom window and asked defendant what he had said. Farris testified that at this point defendant began firing a gun out of the window and Frost ran away from the defendant's house, down the slope of the yard toward the street. According to Farris, Frost bent over as he ran and was hit by one of the six shots fired by the defendant. The shot struck Frost in the lower back at a severe angle. According to Dr. William G. Eckert, a pathologist who performed an autopsy, the bullet entered Frost's body in the lower back area, proceeded through the body penetrating several vital areas and eventually lodged in the neck. Frost made it back to his own front porch where he died.

Police Officer Gary Olson was directed by the police dispatcher to the scene and arrived a few minutes after the shooting. He was told that the man who did the shooting was in defendant's house. Officer Olson and two other officers, who had arrived in the meantime, positioned themselves outside defendant's house. One of the officers yelled for the man in the house to come out. In a few minutes the porch light went on and defendant came to the front door. He was told to step outside and place his hands in the air. The officers then stepped onto the front porch and handcuffed defendant. Olson advised defendant of his constitutional rights and asked if he understood those rights. Defendant said he did and in response to Olson's question as to where the gun was, defendant nodded his head in a northeasterly direction which led the officers to believe the gun was by the side of the house. The officers then took defendant to the north side of the house. Defendant then told the officers that the gun was not there, but that it was in his bureau drawer in the bedroom. Defendant was asked to show the officers where the bureau drawer was and they proceeded into the house to the southeast bedroom where defendant nodded at the bureau drawer directly beside the bed. Olson opened the drawer and saw a blue steel revolver inside the drawer. Olson testified that after viewing the gun, the drawer was closed so the gun would not be disturbed until the laboratory investigators arrived. Olson took defendant to his police car and again advised him of his constitutional rights and asked if he would like to talk about what happened. Defendant again said he understood his rights and that he would talk. Defendant described the incident with the children; that he had given them candy; and about Frost coming to his bedroom window and telling him that he did not appreciate his cussing the children. Defendant told Olson that Frost then turned and walked away, but returned and came back toward the window. Olson testified that defendant said, "Mr. Frost came back, and I didn't know what he had in his hands, so I let him have it."

Several days after the shooting Mr. and Mrs. Edgar Boston, who lived directly across the street from the Childers' house, discovered two holes in the wall of their house which Mr. Boston said were not there prior to July 21, 1973. Police determined the holes were caused by bullets which were recovered, but found to be damaged to the extent that ballistic tests were impossible.

Other testimony will be recited in the course of the opinion as it relates to points on appeal.

Defendant's first two points on appeal concern alleged insufficiency of the state's evidence. The points are interrelated and defendant merges his arguments. He first asserts the verdict and judgment are contrary to the law and evidence with respect to second degree murder, and then further contends the evidence failed to show a malicious, intentional killing.

As we have previously indicated, the evidence presented in the instant record closely parallels that which was before us in *State v. Childers,* supra, wherein we said:

"The state presented a strong case to support its theory that the defendant's killing of Frost met the second degree murder requirements of K. S. A. 21-3402. . . ." (p. 416.)

Nevertheless, we have again closely examined the evidence in the light of the arguments presented by defendant's industrious counsel in his brief filed in the present appeal.

The crime of murder in the second degree is defined in K. S. A. 21-3402 in these words:

"Murder in the second degree is the malicious killing of a human being, committed without deliberation or premeditation and not in the perpetration or attempt to perpetrate a felony."

Defendant structures his arguments in this manner—he admits the shooting and concedes that it was intentional, but he then proceeds to point out the distinction between intentional shooting and intentional killing, and that the statute requires intentional killing. Defendant goes one step further and says that even evidence of an intentional killing is insufficient, absent a showing of malice. Defendant's analysis of the elements of second degree murder is correct. (See *State v. Gregory,* 218 Kan. 180, 542 P. 2d 1051; *State v. Childers,* supra; *State v. Osbey,* 213 Kan. 564, 517 P. 2d 141; and *State v. Roberson,* 210 Kan. 209, 499 P. 2d 1137.) But to reach the conclusion sought by defendant the evidence must be viewed in the light most favorable to him which we cannot do under our long-standing rules of appellate review. (*State v. Sparks,* 217 Kan. 204, 535 P. 2d 901; and *State v. Smolin,* 221 Kan. 149, 557 P. 2d 1241.)

The element of malice may be inferred from the fact that the killing was effected by a deadly weapon. (*State v. King,* 221 Kan.

69, 557 P. 2d 1262; *State v. Hamilton,* 216 Kan. 559, 534 P. 2d 226; and *State v. Blake,* 209 Kan. 196, 495 P. 2d 905.) Neither is the element of intent without evidentiary support in the instant case. Intent, like any element of a crime, may be shown by circumstantial evidence, and a person is presumed to intend all the natural consequences of his acts. (*State v. Wright,* 221 Kan. 132, 557 P. 2d 1267.) Defendant argues this presumption of intent was overcome by his own testimony that he was firing the gun into the ground and by Farris' testimony that the deceased remained at the window untouched and unharmed while four shots were fired. In this connection defendant is viewing conflicting evidence in the light most favorable to his case. On direct examination Farris testified that the deceased began to run after the first shot was fired. Using a police report for impeachment and skillful cross-examination techniques, counsel for defendant persuaded Farris to recant and state that four shots were fired while the deceased was standing at the window. However, in the very next breath, the witness testified the deceased was struck in the back by one of the first four shots, thus, inferentially retracting the recantation.

In contrast to defendant's assertion that he fired all of the shots into the ground, the state presented evidence that the paths of at least two of the errant shots closely paralleled the slope of the terrain and were approximately four feet off the ground at one point in their trajectories. The path of these two shots was established by the recovery of the two bullets from the neighbor's house across the street. Both of these bullets were fired in the direction of the path used by the deceased in fleeing from the premises. Regardless of which view is taken of the record testimony, it is clear that some shots were fired in the deceased's direction and nearly parallel to the ground after he had departed the immediate area of the bedroom window, and while he was attempting to flee from the premises of the defendant. From these circumstances alone an inference of intent to kill may be drawn. A similar contention was rejected under analogous circumstances in the second degree murder case of *State v. Hill,* 211 Kan. 239, 505 P. 2d 704. In that case the rejected third party of a lover's triangle fired several shots through his apartment wall into the apartment and bedroom of his adversary, killing him and wounding the girl who was the subject of their mutual affections.

This court said:

"... Admittedly appellant did the shooting. There was evidence from which the jury could have inferred that the shots were not fired either accidentally or haphazardly but were, without just cause or excuse, carefully directed toward an area known to be occupied by the victims. The contention cannot be sustained." (p. 246.)

The circumstances shown by the instant record likewise permit a reasonable inference of an intent to kill and provide ample evidentiary support for the verdict.

In points three and four defendant contends the definition of maliciously given by the trial court in instruction No. 4 is confusing and erroneous and that he should have been permitted to demonstrate this fact by the affidavit of a juror, which was proffered on motion for a new trial. Defendant argues the jury was confused as to the distinction between intentional shooting and intentional killing. Defendant concedes the instruction was not objected to at trial, but now contends it was clearly erroneous. The instruction in question reads:

"No. 4. Maliciously means wilfully doing a wrongful act without just cause or excuse.

"Intentionally means conduct that is purposeful and wilful and not accidental."

The instruction is PIK, Criminal, Sec. 56.04 and as a definition of malice has been approved in *State v. Wilson,* 215 Kan. 437, 524 P. 2d 224; and *State v. Jensen,* 197 Kan. 427, 417 P. 2d 273. As we noted in Wilson, when read out of context, and apart from other instructions, the instruction might be subject to criticism as being imprecise. However, the instruction is not to be read in isolation. In *State v. Ingram,* 211 Kan. 587, 506 P. 2d 1148, we held:

"The propriety of instructions to a jury is to be gauged by their consideration as a whole, each in conjunction with all other instructions in the case." (Syl. 5.)

See, also, *State v. Blocker,* 211 Kan. 185, 505 P. 2d 1099. Applying this rule in *Wilson,* we considered the malice instruction together with the instruction on second degree murder (PIK, Criminal, Sec. 56.03) and found the resulting combination to be "... most descriptive of the crime. ..." (*State v. Wilson,* supra, p. 439.)

In the instant case, instruction No. 4 was preceded by instruction No. 2, murder in the second degree (PIK, Criminal, Sec.

56.03), and No. 3, involuntary manslaughter (PIK, Criminal, Sec. 56.06). Instruction No. 4 was followed by the definition of wilfully (PIK, Criminal, Sec. 56.04[*c*]). Read together the instructions adequately apprise a jury that the killing and not merely the shooting must be done wilfully to constitute second degree murder. In this connection we held in *State v. Osbey*, 213 Kan. 564, 517 P. 2d 141:

"The term 'maliciously', as it relates to the crime of murder, imports and includes the term 'willfully'." (Syl. 6.)

Following the trial, defendant's counsel had a conversation with the jury foreman which led counsel to assert, on motion for a new trial, that the jury had misinterpreted instruction No. 4. Counsel asked leave to obtain the affidavit of the foreman, the state objected and the trial court sustained the state's position. The matter is controlled by K S. A. 60-441, which reads:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

In *State v. Myers*, 215 Kan. 600, 527 P. 2d 1053, the convicted defendant offered affidavits of jurors in support of his motion for a new trial to show, *inter alia*, that certain instructions on intent and circumstantial evidence were confusing to the jury. In sustaining the trial court's ruling which excluded these affidavits we said:

"The instructions complained of, although somewhat overbroad in comparison with those recommended in PIK, Criminal, are not clearly erroneous. Moreover, as in the point with respect to the juror's comments concerning appellant's failure to testify, the alleged misconduct, if it could be deemed to rise to that level, was not extrinsic but related rather to the reasoning process by means of which certain jurors arrived at and acquiesced in the verdict. That verdict may not be so impugned and the trial court properly excluded the affidavits and denied new trial on this ground." (p. 603.)

So, also, in this case, the matter sought to be explored was not extrinsic to the verdict and thus was inadmissible under K. S. A. 60-441. We find no error shown with respect to defendant's points three and four.

Defendant next contends the trial court erred in admitting statements made by him following his arrest, in particular a

statement to Officer Olson, "Mr. Frost came back, and I didn't know what he had in his hands, so I let him have it." The issue was first presented in pretrial motions to suppress both the gun seized in defendant's bedroom and the statements in question. After an evidentiary hearing the trial court sustained the motion as to the gun finding unlawful search and seizure thereof, but overruled the motion to suppress the statements and specifically found they were voluntarily made. The trial court made the same rulings after an out-of-court hearing during the trial. The trial court found the arrest to have been lawful, but, apparently, because it was effected on the front porch rather than inside defendant's house, found that the warrantless search inside the house was unlawful. Defendant argues the statement in question resulted from the unlawful search and seizure of the gun, that it was tainted thereby and under the fruit of poisonous tree doctrine was inadmissible. The state first takes the position that the trial court erred in finding the search unlawful, contending it was reasonable under the "exigent circumstances" shown to exist and in the alternative the state says that defendant's conduct amounts to consent. As a second alternative position the state contends that even though the gun was the product of an illegal search, the defendant's statements were, nevertheless, admissible since they were not induced by the illegally seized evidence.

Even if the question of the legality of the search is properly before us, we need not decide it in order to determine the issue presented. Assuming the illegality of the search, the question narrows to one of determining whether defendant's statements were brought about by that illegality rather than by means sufficiently distinguishable to be purged of the primary taint. Under *Wong Sun v. United States*, 371 U. S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, the fruits of the poisonous tree doctrine, when applicable, not only bars derivative physical evidence, but also derivative testimonial evidence, such as confessions and admissions obtained as a result of confronting the accused with information learned in an unlawful search. The doctrine is inapplicable, however, where the state learns of the evidence from an independent source or where the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint. This court recognized the teaching of *Wong Sun* and considered the

application thereof in depth in the recent case of *State v. Deffenbaugh,* 216 Kan. 593, 533 P. 2d 1328. In *Deffenbaugh,* as in the case at bar, the issue whether challenged evidence was so connected with an illegal search as to be tainted was presented on a motion to suppress. We said:

". . . This was the issue of fact which had to be determined by the district court at the hearing on the motion to suppress." (p. 599.)

We further noted in *Deffenbaugh* that the trial court's finding was supported by the evidence and could not be disturbed on appeal. There was no connection, in the instant case, between the finding of the gun and the statements made later by defendant. From the time of his arrest and through both trials defendant had admitted the ownership, possession and shooting of the gun. Defendant's intent was the only important disputed issue at trial. While the challenged statement was probative and relevant to the issue of intent, there is no showing whatsoever that the statement was triggered or induced by the finding of the weapon which defendant always admitted firing. There was no causal connection between the search and the statement.

Defendant relies on *McCloud v. Bounds,* 474 F. 2d 968 (4th Cir. 1973) and *Brown v. Illinois,* 422 U. S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, as support for his argument that the fruit of the poisonous tree doctrine renders his statement inadmissible. Both cases are distinguishable on the facts from the case at bar. In *Brown* police officers broke into defendant Brown's apartment, searched it, and then arrested him all without a warrant and, as the court determined, without probable cause. Brown was given full *Miranda* warnings and thereafter, while in custody, made two challenged inculpatory statements. The Illinois Supreme Court affirmed Brown's conviction (56 Ill. 2d 312, 307 N. E. 2d 356), on the rationale, as to the point in question, that the *Miranda* warnings in and of themselves severed the causal connection so that any subsequent statements, even though induced by the unlawful search and arrest, were admissible so long as, in the traditional sense, the statements were voluntary and not coerced in violation of the Fifth and Fourteenth Amendments. The United States Supreme Court granted certiorari because of concern about the implication of its *Wong Sun* holding to the facts of the. *Brown* case. In reversing Brown's conviction the court expressly limited and qualified its holding. The court said:

"It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the *Miranda* warnings, *alone* and *per se*, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited. See *Westover v. United States*, 384 U.S. 436, 496-497 (1966).

"While we therefore reject the *per se* rule which the Illinois courts appear to have accepted, we also decline to adopt any alternative *per se* or 'but for' rule. The petitioner himself professes not to demand so much. Tr. of Oral Arg. 12, 45, 47. The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. . . ." (p. 603.)

The *Brown* decision makes clear there must first be a causal connection between the illegal arrest or search and the statement in question before the issue whether a *Miranda* warning breaks the connection arises. In the case at bar, defendant's arrest was legal, probable cause was obvious and never challenged. The only search involved was the finding of the gun which was left in the bureau drawer. Possession or ownership of the gun was never at issue and the defendant was not confronted with the gun by the officers during their conversation with him. We see no connection between the search and defendant's statement, thus, the issue framed in *Brown* is not presented here.

Likewise, in *McCloud v. Bounds*, supra, it was said:

". . . [T]he state here concedes, that the police had neither a warrant nor probable cause for the search, seizure, and arrest, and that they were therefore illegal." (p. 969.)

McCloud was confronted with an illegally seized unique coin collection which was used to induce or trigger his confession. No such causal relationship is shown in the record presented here. To the contrary, the evidence shows that the challenged statements were the product of defendant's free will, unaffected by and not connected with the seizure of the gun. The evidence fully supports the trial court's ruling on the issue and it cannot be disturbed on appeal.

Defendant next contends the trial court abused its discretion in permitting the state to present rebuttal evidence over defendant's objection. The challenged evidence consisted of testimony of Detective Ronald Eggleston, a crime scene investigator for the Wichita Police Department, concerning the path of two bullets

recovered from a house located directly across the street from defendant's house. Defendant objected to the evidence on the grounds that it was irrelevant and improper rebuttal. The state's purpose in offering the testimony was to refute defendant's assertion that he was firing at the ground and did not intend to hit the deceased. The evidence was relevant to the issue of defendant's intent, the critical issue in the case.

Defendant's argument on the relevancy point focuses on the state's inability to prove positively that the bullets taken from the neighbor's house were fired from the defendant's gun. The state contends that this could not be shown because the damaged condition of the bullets prevented an accurate microscopic comparison. This technical deficiency affects only the weight to be accorded the evidence rather than its admissibility. (*State v. Curtis*, 217 Kan. 717, 538 P. 2d 1383.)

The standards for identification and admission of physical evidence are discussed in *State v. Robinson*, 203 Kan. 304, 454 P. 2d 527, wherein we held:

"The admissibility in evidence of a physical object is to be determined by the trial judge on the basis of its relevance and connection with the accused and with the crime. In order to justify its admission its identity must be shown to the satisfaction of the trial judge." (Syl. 5.)

In *Robinson* we approved the rule stated in 2 Wharton's Criminal Evidence (11th Ed.) Sec. 762, p. 1293. We believe the evidence in the instant case fully supports the trial court's determination as to identification.

Defendant further argues the testimony in question was improper rebuttal in that it could have been offered in the state's case in chief. On this point in *State v. Nirschl*, 208 Kan. 111, 490 P. 2d 917, we said:

"With respect to the propriety of the rebuttal testimony, this court has held that evidence which could have been admitted in the case in chief but which was not, may be admitted in rebuttal to contradict some new fact or circumstance brought forth in the defendant's evidence. That is the case here. The state could not attack the credibility of the defendant's testimony until he had taken the stand. Once that issue was raised, it properly could be rebutted. (citing cases.)" (p. 117.)

Even though the state was aware that defendant would probably testify that he fired into the ground, the state is not required to anticipate what defense might be offered at trial and to offer evidence in its case in chief to meet all probable facets of the

defense, ". . . If so, the state would be required to elicit testimony in its case in chief to cover every possible contingency. . . ." (*State v. Phippen*, 207 Kan. 224, 230, 485 P. 2d 336.) We find no abuse of discretion in the trial court's ruling in this regard.

Defendant next claims error in the admission of three photographs which he says were gruesome, of no probative value and introduced solely for prejudicial effect. In defendant's first trial color photographic slides of the deceased's body, taken during the autopsy, were introduced. On appeal this court found the color photographic slides to be gruesome and that the admission thereof, under the circumstances shown, was error. Apparently, the colored slides were not used in the trial on remand. In the instant case the evidence complained of, as it appears in the record, consists of three black and white photographs labeled Exhibits 1, 10 and 11. Exhibit 1 depicts the front porch of the deceased's house and a pillow lying on the floor. There were dark splotches on the pillow which were said to be blood stains by the state's witness, Merle Horn. Horn was a friend of the deceased and was visiting in his house at the time of the shooting. The photographs were used during Horn's testimony to describe the front porch, where deceased finally came to rest after the shooting. Exhibit 10 is a photograph of the deceased lying on his back at the morgue. It was used primarily to identify the deceased. Neither Exhibit 1 nor Exhibit 10 can be said to be gory or gruesome. Exhibit 11, the only photograph showing the lethal wound, depicts the deceased's back as he lay on his side at the morgue. As a black and white photograph, it cannot be said to be inflammatory and it was of probative value. It was relevant to the pathologist's testimony concerning the nature and angle of the entry wound and the ultimate location of the spent projectile. The evidence was relevant and material in relating the bullet trajectory and direction to the departure of the deceased from the Childers' house and the position of his body when struck.

This court has repeatedly held that the admission of photographs of a decedent, including photographs taken during an autopsy, is not error when they are relevant to matters in issue such as the cause and manner of death and aid the understanding of a pathologist's testimony. (*State v. Steward,* 219 Kan. 256, 547 P. 2d 773; and *State v. Campbell,* 210 Kan. 265, 500 P. 2d 21.) We

find no abuse of discretion in the admission into evidence of the challenged exhibits.

The defendant next claims error in the admission into evidence—over objection—testimony of Officer Fred D. Debes as to statements made by Mrs. Childers. Defendant claims a violation of the marital privilege afforded by K. S. A. 60-428. Officer Debes arrived at the scene within a few minutes after the shooting. While the other officers were arresting defendant and searching for the gun, Debes remained with Mrs. Childers. His testimony concerning the conversation is as follows:

"A. I was assigned to the house to stand by the scene to guard it, and during my station at that house, I noticed she was quite upset, very emotional, and I tried to get her to calm down. She said she had a heart problem, and to keep her from having any further problems, I asked her where her medicine was.

"I got it for her. It was directly around where I was supposed to be stationed. I asked her if I could call someone to take care of her, and she gave her neighbor's name, and I called her. And I finally called her doctor, because she was still very excited, and talked to him.

"During the absence of other officers and before the neighbor got there, I asked her what had taken place at the residence. She stated that she was sleeping in her bedroom, and that at an unknown time, she awakened to hear a cracking noise, and I said, 'What type of a noise was it,' or I asked her what type of a noise it was. She said it sounded like shots. I said how many shots, and she stated at least three, maybe more. She stated that they were very close. I believe I asked her if she meant close together or relatively close to the house. She said just very close. She stated that when she awakened and heard the sounds, she yelled at her husband, asked him if he knew what was going on, and his reply was, 'I told that nigger to stay out of the yard and to keep away from the window,' and I had her repeat this so that I could write it down. Those were her exact words.

"Q. After that, did you have any more conversation, or what did you do then?

"A. I just stood by my assignment waiting for the laboratory investigator, and then further tried to calm her down, because she was still quite excited.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Sir, when you arrived, what kind of mental state was Mrs. Childers in?

"A. Very excited.

"Q. Did she mention that she had anything physically wrong with her at that time?

"A. She stated that she had a heart problem.

"Q. Did you do anything about this?

"A. I asked her if she had any medicine, and then we found it, and I don't recall if she took it at that time, or if I just gave her the bottle.

"Q. Would you consider her irrational at the time?

"A. No, just highly excited, confused."

The defendant objected on two grounds. First that the statement of Mrs. Childers, as testified to by Debes, was hearsay and,

second, that it was a violation of the marital privilege. The state responded by arguing privilege had been waived by the communication of Mrs. Childers to a third party (Debes) and that there had also been a waiver of the privilege by virtue of defendant agreeing to talk to the officers. The state further argued that where a privileged communication between husband and wife had been communicated to a third person, that person, so long as it falls within the exception to the hearsay rule (K. S. A. 60-460 [a]), can relate what the substance of it was because he is not bound by the privilege. The record does not reflect the rationale of the trial court in overruling the objections. The court merely ruled, "I think it is all right."

On appeal defendant points out that the statement in question was made to his wife when no other person was present, thus, it was confidential, and that as an accused the privilege was solely his and could not be waived by his wife under K. S. A. 60-423, citing our opinion in *State v. Glover*, 219 Kan. 54, 547 P. 2d 351.

In addition to the arguments advanced at trial, the state, on appeal, argues that without regard to the marital privilege, the testimony of Officer Debes was admissible under K. S. A. 60-460 (*d*) (2) [res gestae], and K. S. A. 60-463 [multiple hearsay].

As an exception to the hearsay rule, a res gestae statement is defined in these words in the first two clauses of 60-460 (*d*):

"(*d*) A statement (1) which the judge finds was made while the declarant was perceiving the event or condition which the statement narrates, describes or explains, or (2) which the judge finds was made while the declarant was under the stress of a nervous excitement caused by such perception. . . ."

In Gard, Kansas Code of Civil Procedure Annotated, Sec. 60-460 (d), the Author's Commentary reads:

"Clauses (1) and (2) of this section describe conventional res gestae, admissible hearsay with the characteristic of spontaneity arising either from the reaction to contemporary perception or from the excitement which carries over from the event. The Kansas law is unchanged as to these two described kinds of res gestae. . . ." (pp. 469-470.)

While the trial court made no specific separate finding in this regard, we believe the record conclusively shows that defendant's statement to his wife was spontaneous and a part of res gestae and that the restating thereof by Mrs. Childers to Officer Debes arose from the excitement which carried over from the event.

We note, in passing, that the language in clauses (1) and (2) is

identical to that appearing in clauses (a) and (b) of Rule 63 (4) of the Uniform Rules of Evidence, Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings (1953), p. 199. Rule 1(8) of the Uniform Rules, p. 164, provides that a ruling implies a supporting finding of fact. Debes described Mrs. Childers as "very excited" and emotionally upset. She was also suffering from a heart problem and Debes, at her request, got her medicine for her. We further note that the statement of Mrs. Childers was not made as a direct response to any specific question put to her by Debes, but was a part of her spontaneous description of what had happened.

K. S. A. 60-463 reads:

"A statement within the scope of an exception to K. S. A. 60-460 shall not be inadmissible on the ground that it includes a statement made by another declarant and is offered to prove the truth of the included statement if such included statement itself meets the requirements of an exception."

In both instances, the statement made by defendant to his wife and repeated by her to Officer Debes was clearly a part of the res gestae and, thus, excepted from the hearsay rule under the provisions of 60-460 (d). As an exception to section 60-460, the statement was not inadmissible by reason of the provisions of 60-463. We note in *State v. Blake*, 209 Kan. 196, 495 P. 2d 905, that under 60-460 (d) (2) "nervous excitement" is the statutory requisite for admissibility and that even prior to codification the presence of that element has been relied on to admit statements as res gestae.

We have not, heretofore, been confronted with the precise issue presented. However, our holding on the point appears to accord with prevailing authority. This succinct statement appears in 2 Wharton's Criminal Evidence (13th Ed.), Sec. 301:

"A res gestae declaration by one spouse will be admissible against the other, even though the declarant would not have been a competent witness against his spouse."(p. 93.)

The general rule is stated in 29 Am. Jur. 2d, Evidence, Sec. 727, in the following language:

". . . Accordingly, the fact that the declarant is incompetent to testify as a witness will not ordinarily affect the admissibility of his statements under the res gestae rule in either civil or criminal prosecutions. Thus, the res gestae declarations of a husband and wife are admissible for or against each other, even if the spouse would be incompetent to testify as a witness in the case. . . ." (p. 799.)

See, also, 22A C. J. S. Criminal Law, Sec. 662 (7), p. 674.

In a case factually similar to that at bar, and involving statutes comparable to ours, the Supreme Court of South Dakota, in *State v. Burtts,* 81 S. D. 150, 132 N. W. 2d 209, said:

"Mrs. Burtts was incompetent to testify against the defendant, her husband. SDC 1960 Supp. 36.0101 (1). However, she was not called to testify and, as we have said, the statements of the wife were a part of the res gestae. Consequently, the statute rendering the wife incompetent to testify against her husband did not make inadmissible the testimony of either Quenzer or the police officers as to the declarations and statements of the wife. The competency of the declarant is not an essential prerequisite to proof of her declarations as a part of the res gestae. Declarations and statements made by one spouse against the other, are admissible against the other when part of the res gestae. (citing cases.)" (p. 156.)

Cases in accord from other jurisdictions are: *Eubanks v. State,* 242 Miss. 372, 135 So. 2d 183; *State v. Murray,* 67 Nev. 131, 215 P. 2d 265; *Davidson v. State* (Tex. Crim.), 386 S. W. 2d 144; and *People v. Foley,* 64 Mich. 148, 31 N. W. 94.

As previously indicated, the record does not reflect the reasons for the trial court's ruling, but in any event it was correct and must be upheld even though the court may have relied upon a wrong ground or assigned an erroneous reason for its decision. (See, *Owens v. City of Bartlett,* 215 Kan. 840, 528 P. 2d 1235, and cases cited therein.)

Defendant next claims error in the trial court's refusal to give an instruction on self-defense. Self-defense as a defense in a prosecution such as at bar is defined in K. S. A. 21-3211:

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

The phrase "reasonably believes," as it is used in the statute, is clarified by the advisory committee in its notes following the statute. The committee states:

". . . A reasonable belief implies both a belief and the existence of facts that would persuade a reasonable man to that belief."

We agree with the advisory committee's interpretation of the phrase in question. In other words, in order to rely on self-defense as a defense, a person must have a belief that the force used was necessary to defend himself and, also, show the existence of some facts that would support such belief. In this connection, the applicable test was set forth in *State v. Smith,* 161

Kan. 230, 167 P. 2d 594, where in referring to the evidence in such case, we said:

". . . [I]t is well to remember the test is not how much but is there any. . . ." (p. 237.)

We also pointed out in *Smith* that where the giving of a self-defense instruction is warranted by the evidence, failure to give it is reversible error even in the absence of a request.

In response to defendant's contention, the state says that even though defendant might have believed he was in danger there was absolutely no evidence to support such belief. We have carefully examined the defendant's testimony, which is the only evidence on the point and, viewing it in the light most favorable to him, we are, nevertheless, compelled to agree with the state's position. In summary the defendant testified that he had never had any trouble with Mr. Frost prior to July 21, 1973. The two conversations preceding the shooting were very brief, defendant was addressed by Frost as Mr. Childers, there were no verbal threats or threatening gestures made by Frost in either of the two conversations. In his testimony, defendant related the second conversation in these words:

"A. 'Mr. Childers, I asked you to stop molesting my children. I don't mind you giving them candy, but don't cuss them.' I told him, I said, 'Mr. Frost,' I said, 'I ain't cussed your children.' I said, 'Go away and leave me alone.' "

At the conclusion of the second conversation the parties remained silent for about three minutes; Frost was standing outside the window, defendant was lying on his side in bed looking at Frost through the window. Defendant was asked:

"Q. And his standing there like that, and what he said to you, this is what made you scared enough to pull a gun and start shooting; is this correct, sir?

"A. Yes, sir."

There is nothing shown that would persuade a reasonable man to believe that he was in imminent danger. We find no error in this regard.

For his final point on appeal defendant asserts error in the denial of his motion for a new trial. In support of this point defendant merely refers to his arguments made on his other points. We have carefully examined all of the points raised by defendant's industrious and thorough counsel, but find no reversible error shown.

The judgment is affirmed.