(211 P.3d 836)
Nos. 100,926
100,927

STATE OF KANSAS, *Appellant,* v. MIGUEL DIAZ-RUIZ and SERAFIN DIAZ-GOMEZ, *Appellees.*

Opinion filed July 17, 2009.

*Tony Cruz,* assistant county attorney, and *Steve Six,* attorney general, for appellant.

*Steven C. Staker,* of North Central Regional Public Defender's Office, and *Linda M. Barnes-Pointer,* of Junction City, for appellees.

Before MARQUARDT, P.J., MALONE and CAPLINGER, JJ.

CAPLINGER, J.: The State appeals from the district court's order suppressing evidence discovered in the search of the defendants' vehicle following a traffic stop. Because we agree that the scope of the stop was unlawfully extended, and the subsequent consent to search was not sufficiently attenuated from the prior unlawful de-

tention to purge the taint of the illegality, we affirm the suppression.

## I. *Factual and procedural background*

The district court held a combined hearing on the individual suppression motions filed by the defendants, Miguel Diaz-Ruiz and his father, Serafin Diaz-Ruiz. The following factual summary is derived from two sources: (1) the testimony of Kansas Highway Patrol Trooper Christopher Shane Nicholas, the only witness to testify at the hearing; and (2) the videotape of the traffic stop, which was admitted at the hearing.

Nicholas was parked in the median observing traffic on Interstate 70 in Geary County when he saw a pickup truck traveling eastbound with a ladder strapped in the bed of the truck. Although the ladder did not move, Nicholas followed the truck because the ladder was strapped at an angle "and it just—it didn't look right."

As Nicholas followed the truck, he saw the ladder move from "side to side." He activated his emergency lights and pulled the truck over based solely on his belief that the ladder was loose and could pose a road hazard in violation of K.S.A. 8-1906.

The videotape of the stop, which began recording as the defendants' truck pulled over to the side of the road, reveals that the ladder did not move as the driver pulled over.

As Nicholas approached the cab of the truck, he gave the ladder a firm tug. Although the ladder moved from "side to side several inches," Nicholas determined the ladder "probably wasn't going to fall off."

Nicholas approached the passenger side of the truck and advised the defendants that he had stopped them because he suspected the ladder was loose. However, Nicholas stated, "I think it might stay where it's at." The videotape confirms this was Nicholas' first and last reference to the ladder.

Nicholas then asked the defendants where they had come from and where they were going. Diaz-Ruiz, the driver, responded that they were traveling to Kansas City. In response to Nicholas' request for a driver's license, Diaz-Ruiz produced a New Mexico identification card. Nicholas then told Diaz-Ruiz, "I'm not going to give

you a ticket." Through further questioning, Nicholas ascertained that Diaz-Gomez was Diaz-Ruiz' father and the owner of the truck, and the two men planned to do some remodeling work for Diaz-Ruiz' sister.

After again checking the security of the ladder and other items in the truck bed, Nicholas returned to his patrol car and ran a driver's license check, which revealed that Diaz-Ruiz' driver's license was suspended. Nicholas also claimed he wrote a warning to Diaz-Ruiz for failing to secure his load, but opted to give him only a verbal warning.

However, the videotape reveals that approximately 5-6 minutes later, Nicholas returned to the passenger side of the truck, handed Diaz-Ruiz his documents, and advised him his license was suspended. Nicholas did not, however, give Diaz-Ruiz a written or verbal warning for failing to secure his load. Nor did Nicholas arrest Diaz-Ruiz or give him a citation for driving with a suspended license. Instead, he simply advised Diaz-Ruiz that his father would have to drive. Nicholas did not verify whether Diaz-Gomez had a valid driver's license.

Without waiting for the two men to switch places, Nicholas then asked Diaz-Ruiz where his sister lived, and repeated that Diaz-Gomez "probably needs to drive if he can." Nicholas then said, "all right," took a step away from the truck, but immediately turned back to the passenger window and asked the defendants if they "would mind answering a few more questions." Diaz-Ruiz nodded affirmatively.

Nicholas then proceeded to question the men about their remodeling plans and whether they had guns, drugs, or anything illegal in the truck. After Diaz-Gomez responded negatively, Nicholas asked for consent to "inspect his load." Diaz-Ruiz nodded affirmatively. Nicholas ordered Diaz-Ruiz to put the truck in park and told the defendants to "switch places real quick and just sit here."

The two men remained inside the cab while Nicholas and another officer searched the truck. The officers discovered approximately 300 pounds of marijuana underneath the plywood in the bed of the truck.

Diaz-Ruiz and Diaz-Gomez were each charged with one count of possession of marijuana with intent to deliver in violation of K.S.A. 2008 Supp. 65-4163(a)(3) and one count of no drug tax stamp in violation of K.S.A. 79-5204(a) and K.S.A. 79-5208.

Prior to trial, both defendants moved to suppress evidence seized in the search, claiming (1) the initial traffic stop was not supported by reasonable suspicion; (2) the stop lasted longer than necessary to effectuate its purpose; (3) they did not consent to the search; and (4) even if they did consent, that consent did not purge the taint of the unlawful detention.

The district court concluded the initial traffic stop was justified based on the trooper's concern that the ladder was not properly secured. However, the trial court determined that after Nicholas dispelled his concern by checking the ladder, he had no further basis to continue the stop. Thus, the court held that Nicholas' subsequent questioning of the defendants and review of documentation unlawfully extended the scope of the stop. Alternatively, the district court concluded that even if the scope of the stop was not unlawfully extended, the defendants' consent to search was involuntary. Finally, the district court found that if the consent was voluntary, it did not purge the taint of the unlawful detention.

The State appeals the district court's suppression orders in both cases, which have been consolidated for appeal.

## II. Discussion

On appeal, the State first challenges the district court's determination that the scope of the stop was unlawfully extended. The State argues that because the initial stop was justified on the basis of a traffic violation, Trooper Nicholas did not exceed the scope of the stop by asking for a driver's license and proof of insurance and checking the validity of the driver's license. The defendants counter that the purpose of the traffic stop was fulfilled when Nicholas determined the ladder was properly secured, and any further detention was unlawful.

This court reviews a district court's decision on a motion to suppress under a dual standard. While we apply a substantial competent evidence standard to the factual underpinnings of the dis-

trict court's decision, we review the ultimate legal conclusion drawn from those facts de novo. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006).

Substantial evidence is legal and relevant evidence a reasonable person could accept as being adequate to support a conclusion. *State v. Walker*, 283 Kan. 587, 594-95, 153 P.3d 1257 (2007). We do not reweigh evidence, resolve conflicts in the evidence, or reassess witness credibility. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006). Accordingly, although we may consider whether a videotape of a traffic stop supports the district court's factual findings, we do not review the videotape in an effort to invade the district court's province of determining witness credibility or weighing the evidence. *State v. Hess*, 37 Kan. App. 2d 188, 191, 153 P.3d 557 (2006).

The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights prohibit the government from conducting unreasonable searches and seizures. *State v. Ross*, 37 Kan. App. 2d 126, 129, 149 P.3d 876, *rev denied* 284 Kan. 950 (2007) (citing *Terry v. Ohio*, 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 [1968]).

Generally, evidence obtained, either directly or indirectly, as the result of an unreasonable search or seizure cannot be used against the defendant in a criminal prosecution. See, *e.g., Herring v. United States*, 555 U.S. 135, 172 L. Ed. 2d 496, 129 S. Ct. 695, 699 (2009) (explaining limited applicability of exclusionary rule); *Wong Sun v. United States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963) (explaining fruit of the poisonous tree doctrine).

A traffic stop is an investigatory detention and is a seizure implicating the Fourth Amendment. *State v. Thompson*, 284 Kan. 763, 773, 166 P.3d 1015 (2007). An investigatory traffic stop is reasonable, and thus constitutional, if (1) the stop is justified at its inception and (2) the scope and duration of the stop are reasonably related to the initial justification for the stop. *State v. Smith*, 286 Kan. 402, 407, 417-19, 184 P.3d 890, *cert. denied* 129 S. Ct. 628 (2008); *State v. Mitchell*, 265 Kan. 238, 241, 960 P.2d 200 (1998).

Preliminarily, we note that neither defendant cross-appealed the district court's conclusion that the initial stop was justified based on Nicholas' concerns that the defendants' ladder was not properly secured. Thus, that issue is not before us on appeal. See K.S.A. 60-2103(h) (to obtain appellate review appellee must file notice of cross-appeal from adverse rulings).

A. The Scope of the Stop Was Unlawfully Extended.

The State argues the scope of the stop was not improperly extended by his request for a driver's license because it is permissible for a law enforcement officer, during a routine stop, to request a driver's license, registration, and proof of insurance, run a computer check, and issue a citation. See *Thompson*, 284 Kan. at 774; *Mitchell*, 265 Kan. at 245; *State v. DeMarco*, 263 Kan. 727, 733-34, 952 P.2d 1276 (1998); see also K.S.A. 22-2402(1) ("Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and an explanation of such suspect's actions.").

Further, the State points out that during a lawful traffic stop, a law enforcement officer may inquire about matters unrelated to the justification for the traffic stop, question the driver about his or her travel plans, or allow a drug dog to sniff the outside of the stopped vehicle, as long as those actions do not unreasonably lengthen the duration of the stop. See *Arizona v. Johnson*, 555 U.S. 323, 333, 172 L. Ed. 2d 694, 129 S. Ct. 781 (2009) (permitting unrelated questions); *Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005) (drug dog sniffs); *Mitchell*, 265 Kan. at 244 (permitting questioning "during the time it takes to insure the driver has no warrants and the car is not stolen"); *State v. Morlock*, 40 Kan. App. 2d 216, 226-28, 190 P.3d 1002 (2008) (permitting routine questions about the driver's travel plans if questions are reasonably related to scope of traffic stop and do not alter its nature or duration).

The defendants do not dispute that such actions are proper when an individual is lawfully detained following a traffic stop. Rather,

they contend that under the facts of this case, the reason for the stop dissipated when the trooper determined that the ladder was secure. Thus, no further detention was necessary and the trooper unlawfully extended the scope of the stop by questioning the defendants and requesting documentation.

When analyzing whether an officer's actions have exceeded the scope or duration of the stop, courts consider " 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.' " *State v. Kirby*, 12 Kan. App. 2d 346, 355, 744 P.2d 146 (1987), *aff'd* 242 Kan. 803, 751 P.2d 1041 (1988) (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 84 L. Ed. 2d 605, 105 S. Ct. 1568 [1985]).

In suppressing the evidence, the district court relied primarily upon the rationale of *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994). There, a Utah state trooper stopped the defendant's vehicle because he could not read the expiration date on the temporary registration sticker posted in the window. However, as the trooper approached the vehicle, he determined the sticker was valid and had not expired. Nevertheless, after commenting briefly on the sticker, the trooper requested and received the driver's identification and registration and questioned the defendant and his passenger about their travel plans. The trooper then returned to his patrol car and ran a criminal history check, from which he learned that the defendant had a suspended driver's license and prior convictions for assault and drug and gun violations. 29 F.3d at 559-60.

The trooper then returned to the vehicle and asked the driver another question about his travel plans and whether the defendant and his passenger "were 'packing' any alcohol, firearms or drugs." 29 F.3d at 560. Although the defendant responded negatively, the trooper obtained consent to search and ultimately discovered drugs, drug paraphernalia, and a gun. 29 F.3d at 560.

On appeal, McSwain conceded the initial stop was justified, but argued it evolved into an illegal detention after the trooper had dispelled his suspicion regarding the temporary sticker. The Tenth Circuit Court of Appeals agreed, reasoning that the sole purpose

of the stop was to ensure the validity of the temporary sticker, and that purpose was fulfilled when the trooper approached the vehicle and observed that the sticker was valid. 29 F.3d at 561. Thus, the trooper's further questioning of the defendant about his vehicle and travel plans, as well as the trooper's request for defendant's license and registration, exceeded the scope of the stop's underlying justification. 29 F.3d at 561.

The *McSwain* court specifically recognized that an officer conducting a routine traffic stop is permitted to ask about identity and travel plans, and to request a driver's license and vehicle registration, run a computer check, and issue a citation. 29 F.3d at 561. However, the court found such cases inapposite as they involved situations "in which the officer, at the time he or she asks the questions or requests the driver's license and registration, still has some 'objectively reasonable articulable suspicion' that a traffic violation 'has occurred or is occurring.' " 29 F.3d at 561.

Significantly, the court in *McSwain* rejected the State's suggestion that the court's holding would "require the officer to 'stop a vehicle, approach the vehicle on foot, observe it, then walk away, . . . leaving the stopped citizen to wonder what had just occurred.' " 29 F.3d at 562. The court pointed out that its ruling would not prevent an officer in this situation from explaining the reason for the initial detention and then allowing the driver to continue on his or her way without asking for a license and registration and without asking about travel plans. 29 F.3d at 562. Finally, the court held that the defendant's subsequent consent to search the car was insufficient to purge the taint of the unlawful detention, and reversed the district court's denial of the motion to suppress. 29 F.3d at 562-64.

The Tenth Circuit was presented with similar factual circumstances in *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006). There, a Kansas highway patrol trooper stopped the defendant's vehicle at night because he could not read the state of origin or tag number on the vehicle's temporary registration tag. The trooper believed the defendant had failed to display a "clearly visible" tag in violation of K.S.A. 8-133. 438 F.3d at 1045-46.

However, when the trooper approached the vehicle, he could see that the temporary tag was issued by the State of Colorado and appeared to be valid. Nevertheless, the trooper approached the defendant, asked for license and registration, and returned to his patrol car to prepare a warning ticket. When the trooper returned the defendant's license and registration and handed her the warning ticket, he obtained consent to search the vehicle's trunk and ultimately discovered over 20 kilograms of cocaine.

The *Edgerton* court concluded the initial stop was valid, but found the defendant was unlawfully detained after the trooper determined she had a valid, properly displayed, temporary tag. Notably, the court specifically disagreed with the State's argument that the trooper's inability to read the temporary tag because "it was dark out" constituted a violation of K.S.A. 8-133. 438 F.3d at 1051. The court distinguished cases finding violations of the statute when the tag was partially obscured by a bumper or covered with dirt.

Ultimately, the *Edgerton* court reversed the district court's denial of the defendant's motion to suppress, finding that the reasons for the stop dissipated after the trooper was able to read the tag and determined it did not violate K.S.A. 8-133. 438 F.3d at 1051. However, in dicta, the court noted that even a brief encounter between an officer and driver, as authorized by *McSwain*, "might independently give rise to facts creating reasonable suspicion of criminal activity, thus warranting further investigation." 438 F.3d at 1051.

Recently, a panel of this court applied the reasoning of *McSwain* and *Edgerton* in *City of Manhattan v. Enlow*, No. 100,104, unpublished opinion filed March 6, 2009. In *Enlow*, the defendant's vehicle was stopped because the officer believed a piece of paper taped to the back window did not appear to be a valid temporary registration. However, after advising the defendant of the reason for the stop, the officer examined the paper and found it to be a valid auctioneer's transport permit. Nevertheless, because the officer was "ignorant of the law authorizing auctioneer's transport permits," he continued to question the defendant. *Enlow*, slip op. at 2.

The *Enlow* panel concluded the valid traffic stop evolved into an unlawful detention after the officer learned that the paper taped to the window of the vehicle was an auctioneer's transport permit, despite the officer's erroneous belief that a violation had occurred. *Enlow*, slip op. at 4.

The panel reasoned that once the officer read Enlow's auctioneer's tag, he was placed in the same position as that of the officers in *Edgerton* and *McSwain*, who approached the vehicle and saw the defendant's registration was valid. As in those cases, the court found the duration of the stop was unlawfully extended by asking for Enlow's name and driver's license. *Enlow*, slip op. at 6.

Nevertheless, the State argues this case is factually distinguishable from *McSwain* and suggests that the facts here are more closely analogous to those before the court in *United States v. Lyons*, 510 F.3d 1225 (10th Cir. 2007).

There, a Kansas highway patrol trooper noticed the defendant's vehicle was dirty and salty, but had a clean spare tire attached to its undercarriage. Based on his experience, the trooper suspected the spare tire might contain drugs. Further, while the trooper was able to read the license plate, he could not read the expiration sticker. Thus, the trooper pulled the vehicle over based on his suspicion about the tire and his belief that the dirty tag constituted a violation of K.S.A. 8-133.

As the trooper walked up to the stopped vehicle, he wiped the dirt off the tag before approaching the driver's side window and advising the defendant he had stopped the vehicle for an illegible tag. The trooper requested the defendant's license and registration and obtained the rental agreement. While obtaining the documents, the trooper noticed several items which he believed to be common tools of the drug-trafficking trade. And, as the trooper returned to his patrol car, he more closely examined the spare tire, noticing that the rim was salty and dirty but the tire was clean, and that the tire contained fingerprints and tool marks.

The trooper performed a criminal history check, completed a warning ticket, learned that the defendant had prior drug possession and trafficking convictions, and noticed the rental agreement was 2 weeks overdue. The trooper returned the defendant's doc-

uments, handed him the warning ticket and thanked the defendant and passenger for their time. After the trooper had taken a step back from the vehicle, the passenger asked where to find the nearest car wash. The trooper then stepped back toward the vehicle and advised her the nearest car wash was in Topeka. The trooper then stepped back from the vehicle again and asked the defendant if he had any illegal items in the truck and if he could "look in the back." 510 F.3d at 1231. The defendant responded that he had no drugs and consented to the trooper's request to look in the back. Eventually, the trooper discovered 51 pounds of cocaine in the spare tire.

The Tenth Circuit in *Lyons* affirmed the validity of the initial stop based on the trooper's reasonable suspicion of a violation of K.S.A. 8-133. In a footnote, the *Lyons* court distinguished *Edgerton* for the proposition that "no violation of Kan. Stat. Ann. § 8-133 occurs when the officer's inability to read a license plate or temporary registration tag is due to an external condition . . . as opposed to a factor within the defendant's control, *i.e.*, mounting a license plate too low or leaving it covered with dirt." 510 F.3d at 1234 n.3.

Based on the trooper's suspicion of a violation of K.S.A. 8-133, the court further concluded the trooper could temporarily detain the defendant, request his driver's license and registration, run a criminal history check, and issue a warning ticket. 510 F.3d at 1235. The court distinguished *McSwain* and *Edgerton* on the basis that in each of those cases the officers' reasonable suspicion "evaporated once they observed no violation had occurred" and thus the officers had no reason to detain the defendants to perform the tasks incident to an ordinary traffic stop. 510 F.3d at 1236.

In contrast, the *Lyons* court pointed out that in the case before it, the trooper's suspicion that the defendant had an illegible tag "did not evaporate, but rather was confirmed, once he stopped Lyons' vehicle"; thus, the subsequent detention was lawful. 510 F.3d at 1236. Finally, the court also concluded the trooper had reasonable suspicion of illicit drug activity, based on the totality of the circumstances, to detain the defendant after returning his documents and to request consent to search.

In sum, *Lyons* stands for the unremarkable proposition that when a law enforcement officer has reasonable suspicion that a traffic violation has occurred, and that suspicion has not dissipated before the officer speaks with the driver, the officer is permitted to detain the driver, request a driver's license, run a computer check, and issue a citation, if appropriate. *Lyons*, 510 F.3d at 1236.

We find the facts in this case to be more analogous to the facts in *McSwain*, *Edgerton*, and *Enlow* than the facts in *Lyons*. Trooper Nicholas cited only one basis for the stop, *i.e.*, that the ladder was loose in violation of K.S.A. 8-1906. That statute provides:

"(c) No person shall operate on any highway any vehicle with any load unless such load and any covering thereon is securely fastened so as to prevent the covering or load from becoming loose, detached or in any manner a hazard to other users of the highway."

When Nicholas approached the truck, he inspected and jiggled the ladder, and determined that it "probably wasn't going to fall off." He confirmed that the ladder "probably wasn't going anywhere" when he spoke to the defendants, advising them of the reason for the stop. Moreover, the videotape confirms that the ladder was strapped into the truck bed and did not present a hazard to others on the highway. Significantly, Nicholas never mentioned the ladder again, and he did not give the defendants either a verbal or written warning for violating 8-1906(c). Under these circumstances, we find substantial evidence supports the district court's factual finding that the trooper dispelled his suspicion of a possible violation of K.S.A. 8-1906(c) before he approached the defendants.

The State argues that if we hold that any further questioning or requests by the trooper were unlawful after the reason for the stop was dispelled, we are essentially "penalizing" the trooper for something he was not "required" to do, *i.e.*, checking the ladder before approaching the driver. The State suggests hypothetically that if an officer stops a vehicle for a defective tag lamp and "out of curiosity" fiddles with the tag lamp and gets it to work, then the "officer would be obligated to simply leave the scene without taking any further action."

We disagree. In the hypothetical offered by the State, the officer arguably would be permitted to cite the driver for a defective tag

light since technically, the light was not working. More importantly, as the Tenth Circuit noted in *McSwain*, when an officer dispels the reasons for the stop before approaching the driver, he need not simply leave the scene with no further action, as the State suggests here. Rather, the officer can and should approach the driver of the vehicle to briefly explain the reason for the stop and to explain that the reason was dispelled with further investigation.

In conclusion, because the trooper's reasonable suspicion evaporated once he observed that the ladder was secure, the trooper had no reason to detain the defendants to perform the tasks incident to an ordinary traffic stop. Thus, the trooper unlawfully extended the scope of the stop by questioning the defendants regarding their travel plans and requesting identification.

## B. The Consent to Search Was Not Sufficiently Attenuated from the Unlawful Seizure.

The State next argues the district court erred in finding the defendants did not voluntarily consent to the trooper's request to search the vehicle. However, the State premises this argument on the State's claim that the entire detention was lawful—a claim which we have rejected.

Because we have found the scope of the stop was unlawfully extended, we must next consider whether the State has established a break in the causal connection between the illegality and the evidence obtained as a result of it. See *State v. Parker*, 282 Kan. 584, 596, 147 P.3d 115 (2006).

An unconstitutional seizure may taint the consent to search as well as any fruits of the encounter if the nature of the seizure renders the consent to search involuntary. Conversely, a voluntary consent to search can purge the primary taint of an illegal seizure when the connection between the lawless conduct of law enforcement officers and the discovery of the challenged evidence is so attenuated as to dissipate the taint. *Smith*, 286 Kan. at 419.

Here, the district court found the State failed to establish a sufficient break between the unlawful detention and the consent to search. The State does not challenge this ruling in its appeal brief but, instead, simply argues the court erred in finding the consent

was involuntary. Thus, while we could allow the district court's determination to stand without further analysis, for the sake of completeness we have examined the record and we conclude the district court correctly resolved this issue.

Whether the taint of a prior illegality was purged by sufficient attenuation between the unlawful conduct and the discovery of the challenged evidence is a question of fact and we will uphold the trial court's finding if supported by substantial competent evidence. *Smith*, 286 Kan. at 420; *State v. Childers*, 222 Kan. 32, 40-41, 563 P.2d 999 (1977).

In determining if a defendant's consent was tainted by a preceding illegal search or seizure, we consider: "1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (citing *Brown v. Illinois*, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 95 S. Ct. 2254 [1975]); see also *State v. Martin*, 285 Kan. 994, 1003, 179 P.3d 457 (2008) (applying attenuation doctrine).

Although the district court arrived at its conclusion that the taint was not purged without performing a taint analysis, we find the record on appeal sufficient to permit us to do so. See *Martin*, 285 Kan. at 1003 (when record on appeal is sufficient, appellate court is empowered to engage in a taint analysis despite district court's failure to do so).

The videotape of the stop and Nicholas' testimony reveal that after returning Diaz-Ruiz' documents and advising him his driver's license had been suspended, Nicholas again asked Diaz-Ruiz where his sister lived. The trooper also suggested that because of the suspended license, Diaz-Ruiz' father, Diaz-Gomez,"probably needs to drive if he can." Nicholas did not issue Diaz-Ruiz a citation for driving with a suspended license, nor did he determine whether Diaz-Gomez had a driver's license.

Nicholas then took a step away from the truck, but approximately 2 seconds later he turned back to the passenger window and asked the defendants if they would mind answering a few more questions.

The trooper then sought and obtained agreement from Diaz-Ruiz to "inspect his load."

### 1. Temporal proximity and intervening circumstances

Because the request for consent and subsequent search of the defendants' vehicle occurred within seconds of the purported termination of the traffic stop, this factor heavily favors the district court's finding of an insufficient break between the illegal seizure and the search. See, *e.g.*, *McSwain*, 29 F.3d at 563 (discussing several cases in which taint was not purged when "only minutes" or "only moments" passed between illegal detention and subsequent consent to search). Further, no "intervening circumstance" occurred in those very brief moments. See 29 F.3d at 563.

### 2. The purpose and flagrancy of the official misconduct

The trooper's actions throughout the stop also support the district court's finding that Diaz-Ruiz' consent to search did not purge the taint of the illegal seizure. See *Wong Sun*, 371 U.S. at 487-88 (important question in determining whether evidence is tainted is whether police have exploited illegal search or seizure to obtain evidence).

Trooper Nicholas offered only one justification for the traffic stop, *i.e.*, his concern that the defendants' ladder was not properly secured. However, Nicholas determined almost immediately after the stop that the ladder "probably wasn't going to fall off" and he so advised the defendants. This was the only time Nicholas mentioned the ladder.

However, Nicholas then peppered the defendants with questions wholly unrelated to the ladder, including where they had come from, where they were going, who owned the truck, the purpose of their visit, and how long they would be at their destination.

Further, at the suppression hearing, Nicholas testified inconsistently with his actions as revealed by the videotape. According to Nicholas, he gave Diaz-Ruiz a warning for failure to secure his load. However, the videotape shows that just after requesting Diaz-Ruiz'

license, Nicholas only advised Diaz-Ruiz, "I'm not going to give you a ticket."

Nicholas also testified that while he wrote Diaz-Ruiz a warning for failing to secure his load, he opted instead to give him a verbal warning. In fact, the videotape reveals that the trooper never gave either of the defendants a verbal or written warning for failing to secure their load. Instead, as discussed, he clearly told them he didn't think the ladder "was going anywhere" and never mentioned the ladder again.

Finally, at the preliminary hearing and again at the suppression hearing, Nicholas produced a written warning which he claimed he wrote during the stop but did not give to Diaz-Ruiz. Significantly, the warning did not contain a sequential number indicating when it was written, and Nicholas testified at the preliminary hearing that he never gave the warning to the prosecutor.

Finally, and perhaps most disconcerting, even after Nicholas learned that Diaz-Ruiz was driving on a suspended license, he merely notified him that his license was suspended and advised him that Diaz-Gomez would "probably [need] to drive." Moreover, at the suppression hearing, Nicholas conceded that he had no intention of arresting Diaz-Ruiz or giving him a warning for driving on a suspended license. Further, the videotape indicates that Nicholas never verified that Diaz-Gomez had a valid driver's license.

Moreover, while Nicholas testified that his questions regarding travel plans and his request for identification and registration were "routine," the facts belie his testimony. While it may be routine to ask travel questions while obtaining identification and writing up a warning or ticket when a traffic violation is suspected, that is not what Nicholas did here. Instead he asked about travel plans immediately after he advised the defendants of the reason for the stop and told them the ladder "wasn't going anywhere." Moreover, the trooper asked about travel plans before he ever even requested a driver's license from the driver. And, when Nicholas discovered the license was suspended, he took no action other than to advise Diaz-Ruiz that he probably should trade places with his father, who was not asked for a driver's license.

These facts establish that Nicholas' motivation to continue the stop after the reasons for the stop had dissipated was not, as the trooper claimed, routine questioning and review of documents in order to prepare a warning. Rather, the facts demonstrate that the trooper was instead motivated by a desire to search the vehicle of these two Hispanic men. Thus, we conclude the factual circumstances relevant to the third factor—the purpose and flagrancy of the official misconduct—also provide substantial competent evidence supporting the district court's determination that the consent to search was not sufficiently attenuated from the prior illegal conduct to purge the taint of that illegality.

### III. Conclusion

In summary, we find that the scope of the stop was unlawfully extended once Trooper Nicholas had dispelled his suspicion as to the reason for the stop. Further, Diaz-Ruiz' subsequent consent to search was not sufficiently attenuated from the prior unlawful detention so as to purge the taint of the unlawful detention. Accordingly, the district court properly suppressed the evidence discovered during the search of the vehicle.

Affirmed.

MALONE, J., concurring: I concur with the result reached by the majority. However, I write separately to make what may be an inconsequential distinction between Miguel Diaz-Ruiz' consent to a search of his vehicle and his consent to additional questioning by Trooper Christopher Shane Nicholas.

The majority concludes that the scope of the stop was unlawfully extended once Nicholas had dispelled his suspicion of the reason for the stop. I agree. The majority further concludes that Diaz-Ruiz' subsequent consent to search was not sufficiently attenuated from the prior unlawful detention so as to purge the taint of the unlawful detention. I agree with this conclusion, but I think it skips a step in the analysis. Before determining whether Diaz-Ruiz voluntarily consented to a search of his vehicle, we must first address whether he voluntarily consented to additional questioning by Nicholas.

The State argues that when Nicholas returned the documents to Diaz-Ruiz and momentarily stepped away from the truck, the traffic stop ended and the encounter became consensual when Diaz-Ruiz agreed to answer additional questions. The State relies on *State v. Thompson*, 284 Kan. 763, Syl. ¶ 9, 166 P.3d 1015 (2007), which holds that an initial traffic stop can subsequently become a consensual encounter if, under the totality of the circumstances, the law enforcement officer's conduct conveys to a reasonable person that he or she is free to refuse the requests or otherwise end the encounter. The State argues that Diaz-Ruiz voluntarily agreed to answer additional questions after Nicholas concluded the stop. The State then asserts that after the encounter between Nicholas and Diaz-Ruiz became consensual, Diaz-Ruiz voluntarily consented to a search of the truck.

However, *Thompson* is distinguishable from the present case because when the law enforcement officer in *Thompson* requested the driver to consent to additional questions, the encounter had not been "tainted" by an unlawful detention. Here, as we have concluded, the scope of the stop was unlawfully extended once Nicholas had dispelled his suspicion that the ladder was improperly secured in the truck bed.

If Diaz-Ruiz had voluntarily consented to additional questioning by Nicholas, then the encounter would have become consensual and Diaz-Ruiz' subsequent consent to the vehicle search might have been lawful. But Diaz-Ruiz' consent to additional questioning by Nicholas was not voluntary for the same reason the majority concluded that his consent to search was not voluntary, *i.e.*, the consent was not sufficiently attenuated from the prior unlawful detention so as to purge the taint of the unlawful detention.

Stated differently, there are two separate and distinct "consents" that must be addressed in the analysis of the suppression issue. The first is Diaz-Ruiz' consent to additional questioning by Nicholas. Only if that consent is found to be voluntary do we need to determine whether the subsequent consent to search the vehicle was voluntary. Because I conclude that Diaz-Ruiz never voluntarily consented to additional questioning by Nicholas, it follows that

Diaz-Ruiz remained unlawfully detained by Nicholas, and any·evidence seized thereafter must be suppressed.