NOT DESIGNATED FOR PUBLICATION

No. 127,664

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ASHER JAMIL,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC WILLIAMS, judge. Submitted without oral argument. Opinion filed March 6, 2026. Affirmed.

*Lindsay Kornegay*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.


Before WARNER, C.J., HURST and BOLTON FLEMING, JJ.


PER CURIAM: Asher Jamil was charged with aggravated sexual battery, breach of privacy, and domestic battery. At trial, the jury found Jamil guilty of breach of privacy and not guilty of his two remaining charges. Jamil's breach of privacy conviction was related to private videos and images he captured of the victim without her consent, which he disseminated.

Jamil's first issue on appeal is that there was insufficient evidence to support his conviction for breach of privacy. He argues that the State failed to prove he acted with

1

the intent to harass, threaten, or intimidate the victim, and that there was no evidence he disseminated the images—two elements required under K.S.A. 21-6101(a)(8). We disagree and find that the jury was able to properly infer Jamil's intent from the evidence in the record. We also find that the term "disseminating" in K.S.A. 21-6101(a)(8) is commonly understood and requires no additional definition. There was sufficient evidence in the record to show that Jamil disseminated the videos and images.

Jamil also alleges that the district court erred by excluding his testimony that he had no prior arrests or criminal history, and this violated his constitutional right to present a complete defense. But the specific instances of Jamil's good conduct he sought to introduce into evidence are specifically prohibited under K.S.A. 60-447(a).

Jamil also alleges five instances of prosecutorial error based on the prosecutor's repeated use of the words "slut" and "lying slut" when describing the theory of defense. While we find these statements were made in error, we find that error to be harmless. We also find no reversible, cumulative error occurred.

Jamil's final argument is that K.S.A. 21-6101(a)(8) is unconstitutional because it is vague. But Jamil failed to preserve his argument and, in his brief, fails to explain why the argument was not raised in district court. We decline to consider the issue here.

After a thorough review of the record, we note one instance of prosecutorial error, but because that error was harmless, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Asher Jamil and Mary (referenced by pseudonym) were in an on-and-off relationship from 2014 to 2017. In 2017, Mary began seeing W.W., though Mary and Jamil intermittently reconnected.

In April 2022, Mary told Jamil she had broken up with W.W. and began visiting Jamil's home often. Jamil and Mary eventually rekindled their romantic relationship. Both were part of a close-knit, Christian Pakistani community, and Mary expressed concern that rumors of sexual activity could harm her reputation. According to Jamil, Mary told him that if she chose to return to W.W., she would protect her reputation by alleging Jamil had forced her into sexual acts. Jamil began recording some of his encounters with Mary due to this threat. The initial recordings of Mary included arrivals and departures from Jamil's home, and some footage of Mary interacting with Jamil in his home. These recordings were made by Jamil's cellphone and his Ring doorbell camera. Mary was aware that some of these recordings took place.

By May 13, 2022, Mary and W.W. had reconnected. On that day, the couple celebrated Mary's upcoming graduation but briefly argued about Mary receiving calls from Jamil. Mary told W.W. that she would be going home to her parents' home for the evening. Instead, Mary went to a bar. At some point in the evening, Mary called Jamil and asked to come to his home. A Ring doorbell recorded Mary's arrival later that night.

Mary arrived at Jamil's home wearing a floral romper. She had difficulty removing it to use the bathroom, and she asked Jamil for help. Jamil recorded that interaction to show that it was consensual. But Jamil also recorded Mary while she was seated on the toilet with her romper down, and when she was topless in a hallway. Jamil continued to record Mary while she sat on Jamil's lap wearing only a T-shirt and underwear. This video also included Mary and Jamil kissing and Jamil touching Mary's buttocks. In

another video, Mary appeared unconscious while positioned on Jamil's lap as Jamil repeatedly spanked her. Mary later reported that she did not know she was being recorded, had not consented to being filmed, and did not remember much of the night.

At some point during the evening of May 13, 2022, into the early morning of May 14, 2022, W.W. called Mary. W.W. noticed from Mary's speech that Mary appeared to be impaired and did not know where she was. After this call, W.W. fell asleep but later woke up and called Mary a second time. Mary did not answer the phone, but Jamil did and told W.W. that Mary was "with [him] now."

On September 3, 2022, Jamil sent W.W. a Facebook message. By this time, Mary and W.W. had resumed their romantic relationship. The message contained multiple videos and photographs created by Jamil on May 13-14, 2022, including the recordings of Mary using the bathroom and the events that occurred while Mary was seated on Jamil's lap. W.W. forwarded the messages to Mary. Mary was not aware she had been recorded and did not know the recordings existed until receiving them from W.W. Mary had never given Jamil permission to record or distribute any images of her.

The next day, Mary contacted law enforcement and reported the May 13-14, 2022, recordings. Mary told law enforcement she was unable to recall the events of that evening but had not consented to being recorded. She also stated that she had not given anyone permission to share the images and videos with a third party. Mary told law enforcement that she did not have any private interaction with Jamil during her separation from W.W. except for the evening of May 13-14, 2022. Mary also claimed that Jamil had been mentally, physically, and sexually abusive to her.

Jamil was charged with aggravated sexual battery, breach of privacy, and domestic battery. At trial, the jury found Jamil not guilty of aggravated sexual battery and domestic battery, but guilty of breach of privacy pursuant to K.S.A 2021 Supp. 21-

4

6101(a)(8)(b)(2)(A). The district court sentenced Jamil to 9 months in prison, suspended his sentence, and placed him on 18 months of probation. The district court also required Jamil to register under the Kansas Offender Registration Act for 15 years. Jamil timely appeals.

ANALYSIS

DID SUFFICIENT EVIDENCE SUPPORT JAMIL'S BREACH OF PRIVACY CONVICTION?

*Standard of Review*

The standard of review for a sufficiency of the evidence challenge requires this court to "'review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). But in conducting that review, this court does not reweigh evidence, resolve conflicting evidence, or make credibility determinations. 313 Kan. at 209. "This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

Additionally, because resolving this issue requires it, this court conducts an unlimited review to interpret the statutory language of the offense. See *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022). And the most fundamental rule of statutory construction is that the intent of the Kansas Legislature governs if that intent can be established. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). This court must first attempt to determine legislative intent through the statutory language enacted, giving common words their ordinary meanings. 315 Kan. at 698. Unless the statute is ambiguous, courts need not resort to canons of statutory construction or legislative history to determine the legislative intent. *Betts*, 316 Kan. at 198.

5

*Discussion*

Jamil was convicted of breach of privacy as defined in K.S.A. 21-6101(a)(8):

"(a) Breach of privacy is knowingly and without lawful authority:

. . . .

(8) disseminating any videotape, photograph, film or image of another identifiable person 18 years of age or older who is nude or engaged in sexual activity and under circumstances in which such identifiable person had a reasonable expectation of privacy, with the intent to harass, threaten or intimidate such identifiable person, and such identifiable person did not consent to such dissemination."

*Intent*

Jamil first argues that the State failed to prove he acted with the intent to harass, threaten, or intimidate Mary. He argues the plain language of K.S.A. 21-6101(a)(8) requires such an intent, and no witness directly testified that Jamil's motive was to harass, threaten, or intimidate Mary. Jamil also points out that his trial testimony explained the purpose of the videos was to prove his innocence if Mary accused him of forcing her to have intimate contact.

Nevertheless, courts have long recognized that intent can be inferred from the defendant's conduct and the surrounding circumstances. "Intent, like any element of a crime, may be shown by circumstantial evidence, and a person is presumed to intend all the natural consequences of his acts." *State v. Childers*, 222 Kan. 32, 37, 563 P.2d 999 (1977).

Viewing the evidence in the light most favorable to the State, a rational factfinder could infer Jamil's intent to harass, threaten, or intimidate Mary from his conduct. While Jamil testified at trial that the purpose of making the videos was to protect him from being falsely accused by Mary, the evidence submitted to the jury painted a different

6

picture. The videos were not simply limited to Mary entering or exiting Jamil's home. The videos included footage of Mary nude, partially nude, and unconscious which is inconsistent with Jamil's stated intent and defense for making the videos. There was no evidence that Mary consented to Jamil filming her in these various states. And Jamil admitted to sending the videos to Mary's boyfriend, W.W., during a time when Mary and W.W. were in a romantic relationship. Further, on the evening the videos were made, Jamil answered Mary's phone when W.W. called and told W.W. that Mary was with him now. Even if Jamil's testimony as to his intent for initially making the videos was credible, there was no evidence that Jamil needed to share those videos with W.W. at that time to protect himself. Jamil's actions could be reasonably interpreted by the jury to find that Jamil intended to harass, threaten, or intimidate Mary. Sufficient evidence supported the jury's finding of intent.

*Dissemination*

Jamil next argues that insufficient evidence supports his conviction because there is no evidence he disseminated the images as required by K.S.A. 21-6101(a)(8). In his brief, Jamil argues, "The plain meaning of 'disseminate' is to *widely* spread something, but the State presented no evidence that Asher widely spread the photos and videos of Jane." Jamil points out that Merriam-Webster Dictionary defines "disseminate" as "to spread abroad as though sowing seed" or "to disperse throughout." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/disseminate. He argues that because he only shared the videos and images with W.W., there was insufficient evidence to support the required statutory element of "disseminating."

K.S.A. 21-6101(a)(8) does not define the term "disseminating." However, the lack of a statutory definition or jury instruction defining the term does not prevent a jury from applying its common meaning.

In *State v. Hambright*, 318 Kan. 603, 606, 545 P.3d 605 (2024), the defendant was charged with criminal possession of a "dagger" by a convicted felon. At trial, the district court instructed the jury on criminal use of a weapon but did not define the term "dagger" in its instructions. The jury convicted the defendant of criminal possession of a weapon by a convicted felon. 318 Kan. at 606.

The Kansas Supreme Court affirmed the district court's decision to not define the term "dagger" in its instructions:

> "Our analysis is straightforward and relies on two well-established legal principles. First, we apply the principle that jurors may use their common knowledge and experience when assessing witness testimony and examining evidence and may apply their understanding of the common, ordinary words. *State v. Sieg*, 315 Kan. 526, 531-32, 509 P.3d 535 (2022) (jurors could use common knowledge and experience to conclude a spoon was drug paraphernalia; evidence sufficient even though no direct evidence). Second, we apply a corollary legal principle providing that courts will assume the Legislature intends a word to be used in its 'ordinary, contemporary, common meaning' if the Legislature does not define it." *Hambright*, 318 Kan. at 607-08 (quoting *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 851, 397 P.3d 1205 [2017]).

Kansas courts have previously used the term "dissemination" in several contexts. See e.g., *State v. Baker*, 11 Kan. App. 2d 4, Syl. ¶ 8, 711 P.2d 759 (1985) (the State has a legitimate interest in regulating the dissemination of obscenity between consenting adults); *McKenzie v. Foley*, No. 71,381, 1995 WL 18253130, at *2 (Kan. App. 1995) (unpublished opinion) (noting the dissemination of materials within an invasion of privacy action). And within the context of criminal history record information, the Legislature chose to define "disseminate." See K.S.A. 22-4701(g) ("'Disseminate' means to transmit criminal history record information in any oral or written form."). The Legislature chose to define the term in K.S.A. 22-4701(g) but chose not to in K.S.A. 21-

6101(a)(8). The absence of a definition in K.S.A. 21-6101(a)(8) "does not necessarily render the statute ambiguous." *State v. Letterman*, 60 Kan. App. 2d 222, 226, 492 P.3d 1196 (2021).

In the present case, even if we were to adopt the dictionary definitions supplied by Jamil, those definitions do not require any specific number of instances of sharing the materials to satisfy the term "disseminate." The jury is allowed to its "common knowledge and experience" when considering evidence and "may apply [its] understanding of the common, ordinary words." 318 Kan. at 607-08.

Here, the jury was in a position to be able to give the word its common meaning within the context of the case. The evidence in the record reflects that the jurors used their "common knowledge and experience" and their understanding of a "common, ordinary word" to reach a verdict. 318 Kan. at 607. There is no evidence that the jury struggled to interpret the word "disseminating" in its deliberations. It did not ask the district court any question about the term and reached a unanimous verdict—a thoughtful verdict considering the jury found Jamil not guilty of two of the three crimes with which he was charged. The jury's verdict was based on evidence that Jamil admitted sending private videos and images of Mary to W.W., knowing that Mary and W.W. were in a romantic relationship.

We find that because a jury "may apply [its] understanding of the common, ordinary words" and because there is no evidence the jury was unable to apply the term in this case, the term "disseminating" required no further definition. 318 Kan. at 607-08. Considering the evidence in a light most favorable to the State, there is sufficient evidence in the record to support Jamil's conviction based on the statutory term "disseminating" under K.S.A. 21-6101(a)(8).

## DID THE DISTRICT COURT ERR BY FAILING TO INSTRUCT THE JURY ON THE DEFINITION OF "HARASS"?

Jamil requested a jury instruction for the definition of "harass" under K.S.A. 21-6101(a)(8). The district court concluded that defining the term "harass" for the jury would not be legally appropriate.

*Standard of Review*

When analyzing jury instruction issues, we follow a three-step process:

> "(1) determine whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) consider the merits of the claim to determine whether error occurred below; and (3) assess whether the error requires reversal—in other words, whether the error can be deemed harmless." *State v. Hollins*, 320 Kan. 240, 242, 564 P.3d 778 (2025).

The first step is satisfied here because there is no challenge to jurisdiction or preservation. The second step requires the court to consider the merits of the claim by determining whether the instruction was legally and factually appropriate.

We utilize an unlimited review of the entire record to determine whether a requested jury instruction was legally appropriate. 320 Kan. at 242. A requested instruction was factually appropriate if there was sufficient evidence, viewed in a light most favorable to the requesting party, to support giving the instruction. *State v. Mendez*, 319 Kan. 718, 727, 559 P.3d 792 (2024).

*Discussion*

In response to Jamil's request that the district court define the term "harass" for the jury, the district court ruled:

"We had a discussion off the record about this yesterday as we discussed the instructions, as well as right before this hearing. The Court has looked into this issue, looked at the standard PIK as it relates to Instruction Number 11, the breach of privacy, Count 3. Nowhere in this PIK does it indicate that definitions should be given. The definition of harass or any other definition, whether in the elements sections or in the comments section.

"That being said, I don't believe under these circumstances, following PIK, that instruction should be given, or that if definitions should be given, they would have been included in those PIK instructions. That being said, I'm going to deny the request to give those instructions. I don't think they are legally appropriate at this point."

We first consider whether it was legally appropriate for the district court to define the term "harass" in its jury instructions. The breach of privacy statute does not define the term "harass." See K.S.A. 21-6101(a)(8). Jamil acknowledges that "widely used and readily comprehensible" terms need not have a defining instruction but argues that a court should define such terms if the instructions on a whole would mislead the jury. Jamil cites *State v. Armstrong*, 299 Kan. 405, 440, 324 P.3d 1052 (2014), in support of his position.

In *Armstrong*, the defendant alleged the trial court erred in its jury instruction for the crime of voluntary manslaughter by providing a definition for "heat of passion" but not providing a definition for "sudden quarrel" or "unreasonable but honest belief." 299 Kan. at 440.

The Kansas Supreme Court noted:

"This court has held that a trial court 'need not define every word or phrase in the instructions. It is only when the instructions as a whole would mislead the jury, or cause them to speculate, that additional terms should be defined.' *State v. Norris*, 226 Kan. 90, 95, 595 P.2d 1110 (1979). We further stated that '[a] term which is widely used and

11

which is readily comprehensible need not have a defining instruction.' 226 Kan. at 95." *Armstrong*, 299 Kan. at 440.

The court concluded that no definition of "sudden quarrel" or "unreasonable but honest belief" was required:

> "[T]he concept of sudden quarrel is incorporated into the definition of heat of passion; thus, a separate definition is not necessary. The other option—'upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person'—uses widely understood words that do not require definition." 299 Kan. at 440.

Jamil argues that unlike the terms in *Armstrong*, the term "harass" is not a widely understood term. He states that the term "typically includes repeated or persistent conduct, and that is not widely understood or readily comprehensible." Jamil cites no Kansas case requiring that the term "harass" be defined for the jury. "If anything, our lack of caselaw affirmatively directing that a definition be given supports the idea that the term does not need to be defined in most circumstances." *State v. Bolze-Sann*, 302 Kan. 198, 211, 352 P.3d 511 (2015).

Jamil urges us to consider a definition of "harassment" that is found within the Protection from Stalking, Sexual Assault, or Human Trafficking Act ("the PSSAHT"). K.S.A. 60-31a02(d)(1) defines "harassment" as "a knowing and intentional course of conduct directed at a specific person that seriously alarms, annoys, torments or terrorizes the person, and that serves no legitimate purpose." K.S.A. 60-31a02(d)(1).

Jamil states that "the fact that the Kansas Legislature has at times defined 'harassment' confirms that this is not a widely understood term." But Jamil ignores that actions brought under the PSSAHT are civil in nature—not criminal. And the definition statute for the PSSAHT, K.S.A. 60-31a02(d)(1), specifically states that the definitions it provides apply "[a]s used in the protection from stalking, sexual assault or human

trafficking act." K.S.A. 60-31a02(d)(1). There is no indication that the Kansas Legislature intended for these definitions to be considered in applying unrelated criminal statutes.

Further, Jamil provides no legal support for his position. Failure to support a point with pertinent authority or failure to show why a point is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue. *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020). We do not find the Legislature's choice to define "harassment" in K.S.A. 60-31a02(d)(1) relevant to the question here.

Both parties cite *State v. Perkins*, No. 121,304, 2020 WL 5740893 (Kan. App. 2020) (unpublished opinion), in support of their respective arguments. In *Perkins*, a panel of our court considered whether the evidence at trial was sufficient to convict the defendant of harassment by telecommunications device in violation of K.S.A. 2019 Supp. 21-6206(a)(1)(C). *Perkins*, 2020 WL 5740893, at *2.

The crime of harassment by telecommunications device is defined by K.S.A. 2019 Supp. 21-6206(a)(1)(C)—a different criminal statute than the one at issue here defining breach of privacy. See K.S.A. 21-6101(a)(8). In *Perkins*, the court noted that K.S.A. 2019 Supp. 21-6206(a)(1)(C) did not define "harass":

> "The statute itself does not define what it means to 'harass' someone, but the dictionary definition of 'harass' is 'to trouble, worry, or torment, as with cares, debts, repeated questions or demands, etc.' Websters New World College Dictionary 660 (5th ed. 2014). Another dictionary, this one cited by the State, defines 'harass' as 'to annoy persistently' or 'to create an unpleasant or hostile situation for[,] especially by uninvited and unwelcome verbal or physical conduct.' Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/harass (last visited September 18, 2020)." *Perkins*, 2020 WL 5740893, at *2.

13

The panel compared the two different dictionary definitions supplied by the parties and then decided to *adopt both definitions* to conclude there was sufficient evidence to support the conviction:

> "Considering the evidence in the light most favorable to the State, we find the text messages and the attempted phone calls were sufficient for a rational fact-finder to have found beyond a reasonable doubt that Perkins made and transmitted to M.S. comments, requests, suggestions, proposals, images, and text with the intent to trouble, worry, torment, annoy persistently, and create an unpleasant or hostile situation by uninvited and unwelcome verbal conduct. For this reason, we affirm Perkins' conviction for harassment by telecommunications device in violation of K.S.A. 2019 Supp. 21-6206(a)(1)(C)." *Perkins*, 2020 WL 5740893, at *4.

While we are under no obligation to adopt the same analysis in the present case, the dictionary terms discussed in *Perkins* seem to convey the common meaning of the term "harass." See *State v. Fleming*, 308 Kan. 689, 706, 423 P.3d 506 (2018) (finding panel has the right to disagree with a previous panel of the same court). We see no indication from the court's discussion of the term in *Perkins* that the term cannot be easily understood by a jury.

"A district court should only define additional terms if the instructions as a whole would otherwise mislead the jury or cause it to speculate." *Bolze-Sann*, 302 Kan. at 210. In *Bolze-Sann*, the defendant alleged the district court erred by failing to define the word "imminence" for the jury. In rejecting the defendant's claim, the Kansas Supreme Court held "Bolze-Sann does not cite any Kansas appellate law suggesting that a district court must define 'imminence' for the jury. The term is widely used and readily comprehensible." 302 Kan. at 210.

Jamil does not actually contend the lack of a definition for the term "harass" would mislead the jury or cause it to speculate. See *Bolze-Sann*, 302 Kan. at 211. Instead, he

asserts that defining "harass" would have helped the jurors in evaluating his guilt. Nevertheless, the fact that a definition would have been generally beneficial is not sufficient to transform the omission of such definition into legal error. 302 Kan. at 211.

Jurors are expected to "decipher many difficult phrases" without technical definition. *State v. Robinson*, 261 Kan. 865, 877, 934 P.2d 38 (1997). A court need not define widely used, comprehensible terms. See *Hambright*, 318 Kan. at 610-11; *State v. McLinn*, 307 Kan. 307, 341, 409 P.3d 1 (2018). And juries may apply their understanding of common, ordinary words to evaluate the evidence before them. 318 Kan. at 607.

We find that the term "harass" is "widely used and readily comprehensible." See *Bolze-Sann*, 302 Kan. at 210. Nothing in the record suggests that "harass" was used in a technical sense, that its ordinary meaning was unclear to the jury, or that the jury struggled to apply the term to the evidence. As we previously indicated, the evidence in the record shows the jury thoughtfully deliberated, finding Jamil guilty of only one of three charges. It asked no question of the district court that indicated it was unable to deliberate using the instructions it was given. There is no evidence that the lack of a jury instruction defining the term "harass" led to the jury being misled or caused it to speculate. 302 Kan. at 211.

Accordingly, the district court did not err in declining to instruct the jury on a definition of "harass" because such an instruction would have been legally inappropriate. Because the instruction was not legally appropriate, we need not consider whether the requested instruction was factually appropriate.

15

## DID THE DISTRICT COURT VIOLATE JAMIL'S RIGHT TO PRESENT A DEFENSE BY EXCLUDING TESTIMONY THAT HE HAD NO PRIOR ARRESTS OR CRIMINAL HISTORY?

During voir dire, defense counsel made the statement that Jamil had "never been arrested, never been accused, never had any problems with the cops until right now." The prosecutor asked to approach the bench to discuss the statement. A bench conference was held, and at the conclusion of voir dire, the district court asked the parties to research whether Jamil should be allowed to testify that he had never been arrested.

The district court took up the issue the next morning before trial resumed. After hearing arguments from counsel, the district court ruled that Jamil would not be allowed to testify about his lack of an arrest or prior conviction. In its decision, the district court cited K.S.A. 60-447 and *State v. Price*, 275 Kan. 78, 79, 61 P.3d 676 (2003).

On appeal, Jamil argues the district court erred when it prevented him from testifying that he had no prior criminal history or arrests and that this error violated his constitutional right to present a complete defense.

*Standard of Review*

Whether a particular legal principle or statutory rule governs the admission of particular evidence is a question of law subject to de novo review. See *State v. Miller*, 308 Kan. 1119, 1166, 427 P.3d 907 (2018). A principle or rule, however, is applied as a matter of law or as an exercise of the district court's discretion depending on the applicable rule. 308 Kan. at 1166.

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Younger*, 320 Kan. 98, 137-38, 564 P.3d 744 (2025). The party asserting the district

court abused its discretion bears the burden of showing such abuse of discretion. *State v. Peters*, 319 Kan. 492, 497-98, 555 P.3d 1134 (2024).

*Discussion*

The district court relied on K.S.A. 60-447(a) and *State v. Price*, 275 Kan. 78, 61 P.3d 676 (2003), to exclude Jamil's proposed testimony.

K.S.A. 60-447 provides:

"Subject to K.S.A. 60-448 when a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, except that (a) evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible, and (b) in a criminal action evidence of a trait of an accused's character as tending to prove guilt or innocence of the offense charged, (i) may not be excluded by the judge under K.S.A. 60-445 if offered by the accused to prove innocence, and (ii) if offered by the prosecution to prove guilt, may be admitted only after the accused has introduced evidence of his or her good character."

In *Price*, the Kansas Supreme Court held that evidence of specific behavior to prove a character trait is generally inadmissible, except for evidence of conviction of a crime, because K.S.A. 60-447(a) is designed to prevent the introduction of specific instances of conduct as proof of character traits. 275 Kan. at 90-92.

Jamil sought to testify that he was never arrested or charged with any crime. The district court excluded the testimony, reasoning that:

"It appears that good character evidence can come in, but the fact that the defendant has never been arrested and never been charged with a crime, those things are not character—is improper character evidence.

17

"Looking at the statute that has been provided, 60-445-447, (a) dealing with specific instances of conduct, and *State v. Price*, 275 Kan. 78, a 2003 opinion, the Court, based upon that, is not going to allow the defendant to testify that he has never been arrested. Whether he has—I'm not going to prohibit him from presenting proper character evidence under the law. But those specific instances dealing with—because what we are dealing with today is what occurred or did not occur back on May 14, 2022. That is the issue, or the date that these crimes were charged. That being said, I am going to exclude the evidence that has been offered at this point in time, again, but not tying the hands of the defendant to offer proper character evidence."

It is true that a defendant has a constitutional right to present a complete defense, including the right to present relevant evidence supporting their theory of the case. But this right is not absolute and does not override the rules of evidence. *State v. Smith*, 320 Kan. 62, 80, 563 P.3d 697 (2025).

At issue here is the difference between general character evidence and specific instances of conduct. Jamil did not seek to offer evidence that he had a reputation for good character but instead sought to focus on a specific instance of conduct, namely, whether he had been previously arrested or convicted of a crime. Jamil's request to admit these specific instances of conduct triggered an application of K.S.A. 60-447(a):

"Subject to K.S.A. 60-448 when a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, *except that (a) evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible . . . .*" (Emphasis added.) K.S.A. 60-447(a).

In *Price*, within a trial concerning sex crimes committed against a young child, the defendant sought to offer character witnesses to testify about specific instances of the defendant's good behavior around young children. The district court excluded the evidence. On appeal, a panel of our court reversed the district court, and "concluded that

18

K.S.A. 60-447(a), which according to its interpretation was inapplicable, did not apply to evidence tending to prove a good trait." 275 Kan. at 89.

The Kansas Supreme Court reversed the panel and affirmed the district court's exclusion of the evidence, finding:

> "The legislative history is inconsistent with the Court of Appeals' interpretation that K.S.A. 60-447 renders inadmissible only 'evidence of specific instances of conduct . . . which tend to prove the trait to be bad,' but allows 'evidence of a conviction of a crime.' Legislative history rejects the Court of Appeals' conclusion in this case that the 'legislature meant to exclude only those specific instances of conduct which tend to prove the trait to be bad' and that '[b]ecause the character trait at issue here is a good trait, 60-447(a) is inapplicable.' 43 P.3d at 880. In accordance with legislative history, the opposite conclusion is true: Evidence of specific behavior to prove a character trait except evidence of conviction of a crime is not admissible under K.S.A. 60-447(a)." 275 Kan. at 92.

*Price* continues to control the issue raised by Jamil here. After *Price* was decided, additional panels of this court have applied its holding to exclude specific instances of a defendant's good conduct. See, e.g., *Ross v. State*, No. 100,650, 2009 WL 3172782, at *2 (Kan. App. 2009) (unpublished opinion) (applying *Price* to hold "testimony from Ross's biological children that their father didn't molest them would have been inadmissible"); *State v. Albarracin*, No. 97,536, 2008 WL 850143, at *1 (Kan. App. 2008) (unpublished opinion) (applying *Price* to reject defendant's request to have his pastor testify about a specific instance "because the Kansas Supreme Court has ruled that evidence of a specific instance of past conduct is inadmissible when it is used to prove that his conduct was in accord with his good character"). We have no indication that the Kansas Supreme Court has changed its position on this issue. The Kansas Court of Appeals is duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022).

19

Jamil cites one case in support of his argument, *State v. Bowers*, 218 Kan. 736, 738, 545 P.2d 303 (1976). In *Bowers*, the defendant was allowed to testify that he was a faithful Muslim and always went to services. But when the prosecutor attempted to cross-examine and impeach the defendant, he claimed his statement was not character evidence and instead was only evidence of an alibi. The court rejected that argument and allowed cross-examination and impeachment. While the court did make the statement that a defendant may testify about a "past life as blemish-free, or make[] reference to specific prior incidents," it held that doing so opens the door to cross-examination on that information. 218 Kan. at 738. *Bowers* did not examine specific instances of conduct under K.S.A. 60-447(a) and, in any event, was decided before the Kansas Supreme Court's decision in *Price*. Jamil's argument is without merit.

We find here that the district court did not err in its application of K.S.A. 60-447(a), and Jamil has failed to meet his burden of proof to show that the district court abused its discretion.

DID THE PROSECUTOR COMMIT REVERSIBLE ERROR DURING CLOSING ARGUMENTS?

Jamil argues that the State committed prosecutorial error during closing argument by arguing that Jamil's defense was to call Mary a "slut" or a "lying slut."

*Standard of Review*

Appellate courts use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the

20

appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

See also *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021).

*Discussion*

Jamil claims the prosecutor erred by using disparaging comments to describe his defense and by misstating the evidence.

The State used the term "slut" on several occasions throughout closing arguments:

"So I talked about how I don't have to prove that [Mary] is a good person. And let's just be honest. Was she cheating on [W.W.]—cheating on [W.W.] with Asher? Yeah. Right? Yeah, she was. Does she want to own that? No. But does her bad behavior, is that a defense to these crimes, or is that an excuse? A defense is a reason to find the defendant not guilty. An excuse isn't. I'm not going to stress this enough. The, she's just a lying slut defense, isn't a defense. Because at the end of the day, as Mr. Kerns pointed out in opening, there is he said and there is she said and there is the evidence said."

Later, the State continued to use the term:

"So then you go to breach of privacy. This is where I would encourage you—no matter what you think about [Mary's] behavior—you know, on May 14th, you know, was she consenting, was she into it the whole thing or only periods of it? You heard from the defendant himself, she didn't know that he was recording these videos. Again, maybe she is the lying slut. Basically, that's what the defense is. She's just a lying slut. Does she

21

deserve this? Does the guy walking down the alley with $20 bills hanging out of his pocket deserve to be robbed? Maybe he's an idiot, but the robber still robs him and is still guilty of that."

The State used the term on a final occasion:

"Again, is she a good person? I'll let you decide that. But go back and look at all of the elements, and for every crime ask yourself, does the State need to prove that she is not a slut? Because, ultimately, if you find the defendant not guilty, it's just because defense said she's a slut."

*The prosecutor's statements constitute error.*

In response to Jamil's claim of prosecutorial error, the State points out that Jamil's opening statement and evidence focused on asserting that Mary fabricated her allegations to avoid accountability for maintaining relationships with two men simultaneously. The State argued that Jamil highlighted Mary's inconsistent relationships to suggest a motive for dishonesty. But "'a prosecutor's improper comment or argument can be prejudicial, even if the [error] was extemporaneous and made under the stress of rebutting arguments made by defense counsel.' [Citation omitted.]" *State v. Roeder*, 300 Kan. 901, 934, 336 P.3d 831 (2014) (disavowing language in previous cases that defense provocation can justify prosecutorial misconduct), *cert. denied* 575 U.S. 1012 (2015).

A prosecutor is allowed considerable latitude in discussing the evidence and drawing reasonable inferences from that evidence. *State v. Ford*, 320 Kan. 507, 527, 571 P.3d 500 (2025). But a prosecutor may not disparage the role of defense counsel in presenting a defense. *State v. Knox*, 301 Kan. 671, 684, 347 P.3d 656 (2015) ("The prosecutor's statement that it was defense counsel's job to 'make [the witnesses] look like liars' disparaged the role of defense counsel in the adversarial process."). And a prosecutor may not misstate the law. *State v. Z.M.*, 319 Kan. 297, 317, 555 P.3d 190 (2024).

22

We find here that the repeated use of the word "slut" by the prosecutor constituted error because even when considered in context, the remarks disparaged defense counsel's theory to the jury and in one instance, misstated the law. Specifically, the prosecutor's references to the "lying slut defense" inappropriately disparaged the defense's theory and called Jamil's character in presenting his theory in question. Jamil had the right as part of his defense to question the credibility of Mary in front of the jury. The use of that term was unjustified and aimed to inflame the jury through its shock and disparagement, not evidence.

The prosecutor's statement, "[I]f you find the defendant not guilty, it's just because defense said she's a slut," not only disparages the defense theory using inflammatory language—it misstates the law. A prosecutor commits error by misstating the law. 319 Kan. at 317. If a jury finds a defendant not guilty, it is because the State failed to prove its case beyond a reasonable doubt, not because the "defense said she's a slut" as the prosecutor argued.

*The prosecutor's error was harmless.*

Having found prosecutorial error, our next step is to consider whether that error is harmless. Prosecutorial error is harmless "if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

"We may consider the district court's jury instructions and the strength of the evidence against the defendant in determining whether any prosecutorial error is harmless." *State v. Bobian*, 321 Kan. 169, 182, 574 P.3d 385 (2025). "But the strength of

23

the evidence is not our primary focus, and we may find prejudice even in strong cases." 321 Kan. at 182 (citing *Sherman*, 305 Kan. at 111).

Here, we find that the State has met its burden of proof to show beyond a reasonable doubt that the error did not affect the outcome of Jamil's trial. 305 Kan. at 109. We note that the jury was instructed in Instruction 4:

"Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded."

The instruction properly informed the jury of its duty to disregard remarks by counsel that were not supported by the evidence. And there is no indication the jury relied on the remarks of counsel in reaching its verdict. The district court also instructed the jury as to the elements of each crime, negating any impact of the prosecutor's single statement that misstated the law.

Moreover, Jamil's conviction is supported by overwhelming evidence. Jamil admitted to making the videos and images, and there was no evidence at trial that Mary consented to the videos and images being made. The fact that Jamil sent the videos and images to W.W. was undisputed. While Mary's credibility was at issue in the case, the record reflects defense counsel was able to present evidence and cross-examine witnesses to reflect Jamil's defense theory. Jamil was also permitted in his opening and closing to express his theory that Mary was not credible because she was dating both Jamil and W.W. at the same time, and was concerned about her reputation in her small, religious community. The jury was given the opportunity to consider all the evidence in the record. After considering the entire record, we find that the State has demonstrated beyond a reasonable doubt that the prosecutor's error did not contribute to the verdict. See *Sherman*, 305 Kan. at 109.

24

*The cumulative effect of the prosecutor's repeated use of the term "slut" did not deny Jamil a fair trial.*

Jamil argues that the cumulative error rule applies due to the prosecutor's five separate uses of the words "slut" and "lying slut." "Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial." *State v. Cherry*, 320 Kan. 784, 798, 571 P.3d 976 (2025).

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional in nature, the cumulative effect must be harmless beyond a reasonable doubt. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024).

We first find that the errors here are interrelated. 318 Kan. at 483. Each of the errors relate to the prosecutor's use of the term "slut." But repeated uses of the same inappropriate term should be considered within the context of the entire trial. *Cherry*, 320 Kan. at 799 (finding prosecutor's three erroneous uses of "we know" combined with a trial court error in accepting a stipulation from defendant did not affect outcome of trial).

Here, considering the entire context of the trial, the combined effect of the jury instructions and strength of the evidence persuades us that the repeated use of the term "slut" did not affect the outcome of the trial. When we consider the statements in context, while made in error, they were made in rebuttal to Jamil's defense theory that Mary was not credible. Despite the repeated use of the term, Jamil was able to receive a fair trial.

25

He was able to present evidence related to Mary's credibility and fully present his theory of defense. And we again note that the overall strength of the evidence is overwhelmingly in favor of the State. We find that the cumulative effect of these errors was harmless beyond a reasonable doubt. 318 Kan. at 483.

## IS K.S.A. 21-6101(a)(8) UNCONSTITUTIONAL?

Jamil's final argument is that K.S.A. 21-6101(a)(8) is unconstitutionally vague because it fails to define the terms "nude," "sexual activity," or "harass." He specifically states, "K.S.A. 21-6101(a)(8) is unconstitutionally vague on its face because it fails to provide sufficient notice and objective standards for enforcement."

Jamil acknowledges that he raises this issue for the first time on appeal. Issues not raised before the trial court generally cannot be raised on appeal. See *State v. Johnson*, 56 Kan. App. 2d 1293, 1300, 447 P.3d 1010 (2019). This rule also applies to arguments of a constitutional nature. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018).

But an appellate court may consider a newly raised issue when certain recognized exceptions apply. *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021). These exceptions include:

> "'(1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is determinative; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the trial court may be affirmed because it was right for the wrong reason.'" *In re N.E.*, 316 Kan. 391, 407-08, 516 P.3d 586 (2022).

We note that our preservation rule is prudential. 316 Kan. at 407. Jamil failed to raise his constitutional argument in district court and has not explained on appeal why he failed to raise it previously. In his brief, he gives a conclusory explanation that two of the

preservation exceptions allow us to consider his claim. "Here, both of these preservation exceptions apply. This issue involves only a question of law, and it also presents a finally determinative issue."

In *State v. Mendez*, 319 Kan. 718, 730, 559 P.3d 792 (2024), the Kansas Supreme Court explained that an appellate court is not required to consider an argument for the first time on appeal, even when an exception to the general rule applies. And an appellate court is not required to provide a reason for declining to consider an argument for the first time on appeal. 319 Kan. at 730.

As a panel of our court recently pointed out, "appellate courts are primarily designed to review decisions made by district courts and are normally not to be used as forums to introduce new questions that could have been resolved below. Moreover, allowing district courts the initial opportunity to address and resolve such issues promotes judicial economy and allows for the creation of an adequate record for review." *State v. Davis*, No. 127,501, 2025 WL 3687058, at *2 (Kan. App. 2025) (unpublished opinion). We decline to reach Jamil's constitutional argument because he failed to preserve the issue in district court and has offered no explanation as to why he failed to do so.

Affirmed.